**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **M.U., a minor, by her parents, THERESA AND THOMAS URBAN, and THERESA AND THOMAS URBAN, individually**<br><br>     **Plaintiffs**<br><br>     **v.**<br><br>**DOWNINGTOWN HIGH SCHOOL EAST, DOWNINGTOWN AREA SCHOOL DISTRICT, LAWRENCE MUSSOLINE, Ph.D., CRAIG REED, and TOTAL SOCCER, LLC**<br><br>     **Defendants** | **CIVIL ACTION**<br>**NO. 14-04877** |

**PAPPERT, J.**                                                        **APRIL 27, 2015**

<u>**MEMORANDUM**</u>

　　This case concerns the extent to which public high school coaches, administrators and school districts can be subject to liability for injuries sustained by student athletes during interscholastic competition.  Plaintiff M.U. was a promising student and soccer player whose life was indelibly changed after a blow to the head on a high school soccer field.  She asserts that her coach's failure to remove her from the game after the injury and the school district's failure to implement proper policies regarding concussion evaluations amount to a violation of her constitutional rights.  She also alleges that this conduct violated Pennsylvania tort law.  Finally, she contends that a private company with which the coach was affiliated was negligent in creating a "soccer culture" that placed undue pressure on student athletes to play even while injured.

　　The Court dismisses M.U.'s claims.  Under the facts currently alleged neither the coach's nor the school district defendants' conduct rises to the level of a constitutional violation.

Additionally, those parties are immune from state tort liability under Pennsylvania's Tort Claims
Act.  Finally, M.U. has failed to allege facts sufficient to state a plausible claim that the private
soccer company was negligent under state law.

**FACTUAL AND PROCEDURAL BACKGROUND**

In the late summer of 2012, M.U. was an incoming freshman at Downingtown High
School East ("DHSE") and a member of the school's varsity soccer team.  (Am. Compl. ¶ 14,
Doc. No. 15.)  Her coach was Craig Reed ("Reed").  (*Id*. ¶ 15.)  Reed was demanding,
scheduling early-morning and two-a-day workouts throughout the summer.  (*Id*. ¶ 17.)  He also
urged his players to buy packets of lessons from Total Soccer, LLC ("Total Soccer"), a soccer
training facility he operated as a side business.  (*Id*. ¶ 19.)  Although participation in Total Soccer
was optional, the players and their parents knew that participation was required to make the
DHSE varsity team.  (*Id*.)

M.U. also played on a travel soccer team coached by Reed.  (*Id*. ¶ 20.)  Reed told M.U.
that success on the soccer field could lead to an athletic scholarship at a college with a top soccer
program.  (*Id*. ¶ 16.)  He often compared M.U. to another player who had gone on to play soccer
for a Division I college.  (*Id*. ¶ 22.)  As a result, M.U. felt significant pressure to perform well for
Reed.  (*Id*. ¶ 16.)  She would often come home in tears after the summer practices before her
freshman year.  (*Id*. ¶ 23.)

On August 20, 2012, M.U. was playing in a DHSE preseason scrimmage.  (*Id*. ¶ 24.)  At
some point during the game, she jumped to head the ball and collided with another player who
was also attempting to head the ball.  (*Id*. ¶ 25.)  The other player struck M.U. on the head.  (*Id*.)
M.U. felt her neck snap back from the impact, and she fell to the ground.  (*Id*. ¶ 26.)  She began
crying, knowing that she had hit her head.  (*Id*. ¶ 29.)

M.U. heard the opposing coach, who was within earshot of Reed, saying that M.U. should be taken out of the game.  (*Id.* ¶ 27.)  One of M.U.'s teammates told Reed that M.U. had been hit in the head and needed to come out of the game to be evaluated.  (*Id.* ¶ 28.)  Reed did not remove M.U. from the game.  (*Id.* ¶ 30.)  Rather, M.U. stayed in for the rest of the game, during which time she had collisions with other players and headed the ball several times.  (*Id.* ¶ 31.)

M.U. began to experience headaches on the bus ride home from the scrimmage.  (*Id.* ¶ 32.)  The next day, she was dizzy and had black spots in her field of vision.  (*Id.*)  The day after that, she felt physically unable to play soccer and went to see the athletic trainer.  (*Id.* ¶ 33.)  M.U.'s mother picked her up from the trainer's office and took her to the hospital where doctors confirmed that M.U. had a traumatic brain injury.  (*Id.* ¶¶ 33, 34.)

M.U.'s injury resulted in headaches, profound fatigue, difficulty sleeping, anxiety, difficulty concentrating, memory loss, and difficulty finding words.  (*Id.* ¶ 37.)  Unable to tolerate a full day of school, she missed more than 80 days during her freshman year.  (*Id.* ¶¶ 35, 36.)  Her grades slipped dramatically.  (*Id.* ¶ 38.)  Although her grades improved slightly in her sophomore year, they did not improve to pre-injury levels.  (*Id.* ¶ 39.)  This drop in academic performance will have long-term effects on M.U.'s academic and economic future.  (*Id.* ¶ 40.)

M.U., through her parents, filed suit and asserted claims against Downingtown Area School District ("DASD"), DASD Superintendent Dr. Lawrence Mussoline ("Mussoline"), DHSE, Reed, and Total Soccer.  (Doc. No. 1.)  Before any defendant had filed an answer, the parties stipulated that M.U. could file an amended complaint.[1]  (Doc. No. 14.)  M.U.'s amended complaint was filed shortly thereafter.

---

[1]     Approximately two weeks before the parties stipulated to allow the filing of an amended complaint, Total Soccer filed a motion to dismiss the complaint for failure to state a claim.  (*See* Doc. No. 11.)  The Court, apparently

The amended complaint contains four counts. Count One, brought pursuant to 42 U.S.C. § 1983, asserts a violation of M.U.'s due process right to bodily integrity against DASD, DHSE, Mussoline, and Reed. This cause of action is premised on the state-created danger theory of § 1983 liability. Count Two alleges negligence against DASD, DHSE, Reed, and Total Soccer. Count Three asserts recklessness against Reed and Total Soccer. Count Four, brought by M.U.'s parents individually, seeks recovery of medical costs incurred on their daughter's behalf against all defendants.

All defendants filed motions to dismiss the amended complaint, at least in part. Mussoline moves to dismiss M.U.'s §1983 claim against him. (Sch. Defs.' Mot. to Dismiss, Doc. No. 19.) DASD, DHSE, and Reed in his capacity as a school employee move to dismiss M.U.'s tort claims against them, arguing that they are immune from liability under state law. (*Id.*) Total Soccer and Reed in his capacity as an agent or employee of Total Soccer move to dismiss M.U.'s tort claims against them for failure to allege facts sufficient to state a claim upon which relief can be granted. (Total Soccer Mot. to Dismiss, Doc. No. 18.)

After these motions were fully briefed, the Court *sua sponte* ordered M.U. and the school district defendants to submit briefing on whether the amended complaint states a claim upon which relief can be granted under the state-created danger theory of § 1983 liability. (Doc. No. 27.) The parties submitted the requested briefing. (Doc. Nos. 28, 29.) The Court then heard oral argument on the state-created danger issue and the claims against DHSE, DASD, Mussoline, and Reed in his capacity as a DASD employee.

---

unaware that the parties had stipulated to allow the filing of an amended complaint, granted that motion without issuing an opinion, noting that M.U. had not filed a timely opposition. (Doc. No. 12.) The next day, however, the Court vacated its order granting the motion and approved the parties' stipulation to allow the filing of an amended complaint. The Court does not assign any weight to the prior dismissal when deciding the instant motions.

**LEGAL STANDARD**

Both of the pending motions to dismiss are brought pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  A Rule 12(b)(6) motion tests the sufficiency of the factual

allegations in the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  When

confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis.  *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the district court "must accept all of

the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  *Id.* at 210-

11.  Then, it "must determine whether the facts alleged in the complaint are sufficient to show

that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009)).  When making this determination, the court can consider "the allegations

contained in the complaint, exhibits attached to the complaint and matters of public record."

*Pension Benefit. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

The district court must "construe the complaint in the light most favorable to the plaintiff . . . ."

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

**DISCUSSION**

**M.U.'s Federal Law Claims**

M.U.'s Section 1983 Claim against Mussoline

M.U. asserts a single claim against Mussoline under 42 U.S.C. § 1983.  The amended

complaint, however, contains no factual allegations regarding any conduct by Mussoline.  M.U.

has therefore failed to state a claim under § 1983 against Mussoline individually.  *Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must

have personal involvement in the alleged wrongs; liability cannot be predicated solely on the

operation of *respondeat superior*.").  To the extent that M.U. has named Mussoline as a

mechanism to assert liability against DHSE or DASD, the claim is duplicative of the claims brought against those entities directly. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief.") (citation omitted); *see also Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) ("We will affirm the District Court's dismissal of the claims against the officers in their official capacities because a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them."). M.U.'s § 1983 claim against Mussoline is dismissed.

<u>M.U.'s Section 1983 Claim under the State-Created Danger Theory</u>

M.U. also asserts a claim against DASD, DHSE, and Reed pursuant to 42 U.S.C. § 1983. Section 1983 reads, in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." Section 1983 does not create substantive rights. Rather, "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). Consequently, under § 1983, a plaintiff "must plead a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips*, 515 F.3d at 235.

Here, M.U. alleges a deprivation of her right to bodily integrity as protected by the Fourteenth Amendment of the United States Constitution.  (*See* Am. Compl. ¶ 51.)  Defendants do not dispute that such a right exists.  *See Phillips*, 515 F.3d at 235 ("Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment."); *see also Gremo v. Karlin*, 363 F. Supp. 2d 771, 781 (E.D. Pa. 2005) (same) (citing *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1368 (3d Cir. 1992)).

M.U. does not contend that any state actor directly violated her right to bodily integrity. She alleges instead that collisions with other unnamed soccer players were the direct cause of her injuries.  (*See* Am. Comp. ¶ 31.)  She also alleges, however, that Reed significantly increased the risk that M.U. would be injured by keeping her in the game after the initial collision in which she hit her head.  (Am. Compl. ¶ 56.)  In other words, M.U. pleads her § 1983 claim under the state-created danger theory of § 1983 liability.

The state-created danger theory originated with the Supreme Court's decision in *DeShaney v. Winnebago Cnty Dep't of Soc. Serv.*, 489 U.S. 189 (1989).  There, the Court recognized that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *Id.* at 196.  The Court, however, recognized a "special relationship" exception to this general rule where "the State takes a person into its custody and holds him there against his will . . . ."  *Id.* at 199-200.  Under the facts before it, the Court concluded, "While the State may have been aware of the dangers that [plaintiff] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*."  *Id.* at 201 (emphasis added).

7

Several courts, including the Third Circuit Court of Appeals, seized on this statement to formulate a second exception to the general rule that the state has no affirmative duty to protect citizens from private injury: the state-created danger theory.  The Third Circuit adopted this theory as "a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983" in *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996).  There, on a late January night, Samantha Kneipp and her husband Joseph were walking home from a bar when they got into an argument.  *Id.*  Several Philadelphia Police Officers responded to the scene.  *Id.*  Samantha was visibly intoxicated, smelled of alcohol, and was unable to stand by herself.  *Id.*  Joseph asked an officer if he could go home to relieve the babysitter, to which the officer replied, "Yeah, sure." *Id.* at 1202.  Joseph then left the scene.  *Id.*  The officers later sent Samantha home alone, but she never reached her apartment.  *Id.*  She was found unconscious at the bottom of an embankment nearly two hours later.  *Id.* at 1203.  Her exposure to the cold resulted in hypothermia that caused permanent brain damage.  *Id.*

The Third Circuit found a viable claim pursuant to the state-created danger theory under these facts.  It ruled that there was enough evidence in the record to support a finding that the officers acted in willful disregard for Samantha's safety and "used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened." *Id.* at 1209.  It reversed the District Court's grant of summary judgment in favor of the officers, concluding, "[T]he evidence submitted was sufficient to raise a triable issue of fact as to whether the police officers affirmatively placed Samantha in a position of danger." *Id.* at 1211.

Subsequent cases, many involving law enforcement, have examined the boundaries of the state-create danger theory since its articulation in *Kneipp*.  *See, e.g.*, *Morse v. Lower Merion Sch.*

*Dist.*, 132 F.3d 902, 908 (3d Cir. 1997) (holding that school district could not have foreseen that allowing construction workers to use an unlocked back entrance for access to the school building would result in the murderous act of a mentally unstable third party); *Schieber v. City of Phila.*, 320 F.3d 409, 421 (3d Cir. 2003) (refining culpability standard and ruling that police officers were not deliberately indifferent to substantive due process rights of murder victim); *Bright v. Westmoreland Cnty*, 443 F.3d 276, 283-84 (3d Cir. 2006) (ruling that law enforcement officials cannot "create danger" for § 1983 liability by expressing an intention to detain someone without doing so or by noting a probation violation but not revoking that probation); *Phillips*, 515 F.3d at 236 (ruling that 911 Call Center supervisor's failure to suspend employee who was using the Call Center's computers to improperly access confidential information was not an affirmative act necessary for a state-created danger claim). As currently applied in the Third Circuit, plaintiffs are required to satisfy four elements to state a viable claim under the state-created danger theory.

*First*, the plaintiff must show that the harm ultimately caused to the plaintiff was foreseeable and fairly direct. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) (noting elements of state-created danger test). This element requires the plaintiff to show "an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips*, 515 F.3d at 238. "This inquiry essentially asks whether the alleged misconduct and the harm caused were 'too attenuated' to justifiably hold the defendant liable." *D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 625 (M.D. Pa. 2009) (quoting *Phillips*, 515 F.3d at 239).

*Second*, the plaintiff must show that the state actor acted in a manner that shocks the conscience. *See Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) ("To generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'") (quoting

9

*Cnty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  "Whether executive action is conscience shocking . . . depends on the context in which the action takes place."  *Schieber*, 320 F.3d at 417.  Where state officials "are afforded the luxury of a greater degree of deliberation and have time to make unhurried judgments," deliberate indifference is sufficient to show conscience shocking behavior.  *Phillips*, 515 F.3d at 240.  Where the state official is in a "hyperpressurized environment" with little time for deliberation, on the other hand, state action is conscience shocking only where there is intent to cause harm.  *Id.*

     *Third*, there must be some relationship between the state and the plaintiff.  *Mark*, 51 F.3d at 1152.  This element is not the same as the "special relationship" set forth in *DeShaney*.  Rather, all that is required here is that the "Plaintiff must be able to establish that she was 'a foreseeable victim of a Defendant's acts in a tort sense.'"  *Hillard v. Lampeter-Strasburg Sch. Dist.*, No. 03-cv-2198, 2004 WL 1091050, at *6 (E.D. Pa. May 13, 2004) (quoting *Kneipp*, 95 F.3d at 1209 n.22); *see also Morse*, 132 F.3d at 913 ("The primary focus when making this determination is foreseeability.").

     *Fourth*, the plaintiff must show that "the state actor used its authority to create an opportunity which otherwise would not have existed for the specific harm to occur."  *Morse*, 132 F.3d at 914.  "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."  *Bright*, 443 F.3d at 282.  As such, a plaintiff must show that it was the state's "affirmative action, rather than inaction or omission" that increased the risk of harm.  *Phillips*, 515 F.3d at 236; *see also Bright*, 443 F.3d at 282 ("[U]nder the fourth element of a state-created danger claim, '[l]iability under the state-created danger theory is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger.'") (quoting *D.R.*, 972 F.2d at 1374).

While these four elements of a claim under the state-created danger theory of § 1983 liability are well established in this Circuit, their application in the context of high school sports is a relatively recent phenomenon.  For example, in *Alt v. Shirey*, No. 11-cv-0468, 2012 WL 726579, at *12 (W.D. Pa. Feb. 7, 2012), *report and recommendation adopted*, 2012 WL 726593 (W.D. Pa. Mar. 1, 2012), the court found that the plaintiff had stated a claim under the state-created danger theory for injuries suffered while playing high school football.  There, during two separate games, Zachary Alt sustained hits to the head and experienced a ringing sensation in the ears and a temporary loss of hearing.  *Id.* at *1.  Although these hits occurred within the view of coaches and trainers, Alt was not evaluated for a concussion.  *Id.*  In a subsequent game, Alt was again involved in a helmet-to-helmet hit with an opposing player.  *Id.* at *2.  He was "clearly disoriented, but was able to jog off the playing field in a laborious fashion."  *Id.*  He then "aimlessly walked the length of his team's sideline."  *Id.*  His teammates observed his erratic behavior and "immediately recognized that something was awry . . . ."  *Id.*  Despite all of this, one of Alt's coaches put Alt back in the game with specific instructions to "deliver a substantial hit to the opposition's middle linebacker . . . ."  *Id.*  This instruction was Alt's last memory of the game.  *Id.*  A subsequent examination showed that Alt had sustained a substantial closed head injury that resulted in "numerous physical, emotional, and cognitive injuries . . . ."  *Id.* at *3.  The court found that Alt sufficiently pled a § 1983 claim under the state-created danger theory on these facts.  *Id.* at *12.

Likewise, the court found a sufficiently pled state-created danger claim in *Mann v. Palmerton Area Sch. Dist.*, 33 F. Supp. 3d  530, 539 (M.D. Pa. 2014).  There, plaintiff Sheldon Mann was hit by a teammate running at him at full speed during a high school football practice.  *Id.* at 534.  After the hit, Mann "reported feelings of numbness and/or disorientation to the

coaching staff, and [his] behavior was erratic." *Id.*  Nevertheless, the coaches told Mann to

continue with the practice without evaluating him or performing any concussion testing.  *Id.*

Later in the practice, Mann was hit again by a teammate running at full speed.  *Id.*  After the

second hit, Mann was "confused, dazed, unable to continue practice, and he experienced physical

manifestations of his injury like dry heaving." *Id.*  Mann later was diagnosed with traumatic

brain injury that resulted in a number of serious and permanent cognitive deficiencies.  *Id.* at

535.  The court found that these facts were sufficient to survive a motion to dismiss with regard

to a state-created danger claim.  *Id.* at 539; *see also, e.g.*, *Moeck v. Pleasant Valley Sch. Dist.*,

983 F. Supp. 2d 516, 528 (M.D. Pa. 2013) (ruling that state-created danger theory was

sufficiently pled where high school wrestler was injured when forced to wrestle much heavier

teammate during practice); *Sciotto v. Marple Newtown Sch. Dist.*, No. 98-cv-2768, 1999 WL

79136, at *4 (E.D. Pa. Feb. 9, 1999) (ruling that high school wrestler who was injured when

forced to wrestle older, stronger, and heavier adult wrestler sufficiently pled a state-created

danger claim).

　　　Other courts have found claims under the state-created danger theory in the high school

sports context to be insufficiently pled.  For example, in *Yatsko v. Berezwick*, No. 06-cv-02480,

2008 WL 2444503, at *6 (M.D. Pa. June 13, 2008), the court found that the plaintiff's allegations

did not state a claim for relief under the state-created danger theory.  There, Tracey Yatsko, a

high school basketball player, was injured when she had a head-to-head collision with another

player during a game.  *Id.* at *2.  She immediately experienced problems with her vision and a

severe headache.  *Id.*  Her coaches removed her from the game, and Yatsko did not return to play.

*Id.*  On the bus ride to a game the following day, Yatsko told her coaches and teammates that she

had suffered a concussion and did not feel well.  *Id.*  The coaches set up a signal that Yatsko

could use if she needed to leave the game.  *Id.*  Yatsko played in the game, but collapsed in the

locker room afterward.  *Id.*  This incident led to "serious brain injuries" and "blurred vision, loss

of balance, headaches and depression."  *Id.*

 The court found that these facts failed to state a claim for relief under the state-created

danger theory.  *Id.* at *6.  The court's decision turned on whether the alleged behavior of the

coaches shocked the conscience.  The court summarized Yatsko's allegations as follows: "her

coaches had her under their care, knew she probably had a concussion[,] did not take forceful

action to ensure that she received treatment[, and] did not prevent [Yatsko] from acting on her

desire to play in a subsequent game, despite their knowledge of her continued physical

maladies."  *Id.* *5.  The court recognized that these allegations likely stated a claim for

negligence under Pennsylvania law.  *Id.* at *5.  However, it ruled that the coaches' actions "do

not represent the sort of egregious official behavior that would shock the conscience and allow

plaintiff to raise a constitutional claim."  *Id.*

 Similarly, the court found a failure to state a claim under the state-created danger theory

in *Leonard v. Owen J. Roberts Sch. Dist.*, No. 08-cv-2016, 2009 WL 603160, at *7 (E.D. Pa.

Mar. 5, 2009).  In that case, plaintiff Jade Leonard was impaled by a javelin thrown by a

teammate during an after school track and field practice.  *Id.* at *1.  She alleged that her coaches

had increased her risk of injury by not properly coaching, training, or protecting the students

under their charge.  *Id.*  The court ruled that the complaint did not allege facts sufficient to meet

the fourth element of the state-created danger test and dismissed the complaint accordingly.  *Id.*

at *7; *see also, e.g.*, *Lavella v. Stockhausen*, No. 13-cv-0127, 2013 WL 1838387, at *4 (W.D. Pa.

May 1, 2013) (ruling that complaint failed to state a plausible claim for relief under state-created

danger theory where cheerleader was injured when struck in the head on multiple occasions while participating in cheerleading stunts).

M.U.'s Section 1983 Claim against Reed

With these cases in mind, the Court turns to M.U.'s allegations in the amended complaint, first evaluating M.U.'s § 1983 claim under the state-created danger theory as to Reed.  *See Kneipp*, 95 F.3d at 1213 ("The precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual police officers, as the City's liability for a substantive due process violation does not depend upon the liability of any police officer.").

The Court finds that M.U.'s allegations as to Reed satisfy the first and third elements of a state-created danger claim.  M.U. alleges that Reed was a "soccer coach and trainer" who not only coached the DHSE girls' varsity soccer team, but also coached a travel soccer team and conducted soccer training as a side business.  (Am. Compl. ¶¶ 6, 18, 20.)  These facts taken as true, and all reasonable inferences that can be drawn from those facts, are sufficient to show that Reed was aware that leaving a soccer player in a game after she suffers a blow to the head puts that player at an elevated risk of additional injury.  M.U. alleges that her injuries stem from contact with other players and "headers" that occurred after her initial collision.  (Am. Compl. ¶ 31.)  As soccer is a contact sport, it was foreseeable that these subsequent impacts would occur, and they were a fairly direct result of Reed's conduct of leaving M.U. in the game.  M.U. alleges facts sufficient to satisfy the first element of a state-created danger claim.

M.U. also alleges facts sufficient to show that there was a relationship between her and the state defendants – the third element of a state-created danger claim.  M.U. was a player on the DHSE girls' soccer team, which Reed coached.  (*See* Am. Comp. ¶ 14.)  She was a

foreseeable victim of Reed's alleged acts.  Consequently, the facts alleged in the amended complaint satisfy the third element of the state-created danger claim as to Reed.

On the other hand, M.U. fails to allege facts sufficient to satisfy the second and fourth elements of her state-created danger claim as to Reed.  M.U. does not allege facts sufficient to show that Reed engaged in conduct that shocks the conscience, even at the lowest end of the culpability continuum – deliberate indifference.  *See Phillips*, 515 F.3d at 241 ("[T]hree possible standards can be used to determine whether state action shocked the conscience: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm.").  The only allegations against Reed that are relevant to M.U.'s state-created danger claim are that Reed kept M.U. in the game after she suffered the blow to the head and decided that M.U. did not need to be evaluated for a concussion.  (Am. Compl. ¶ 30.)  These allegations sound in negligence, and "negligence is not enough to shock the conscience under any circumstances."  *Schieber*, 320 F.3d at 419; *see also Morse*, 132 F.3d at 911 ("[M]erely negligent acts cannot support a claim under the state-created danger theory of § 1983.").

It is particularly relevant that M.U. does not allege that she made any subjective complaints or displayed any objective signs that she had suffered a concussion during the game. She does not allege that she was clearly disoriented or displaying erratic behavior as did the plaintiff in *Alt*.  Nor does she allege that she "experienced physical manifestations" of her injury such as dry heaving, as did the plaintiff in *Mann*.  She does not allege that she complained to Reed or anyone else at the time or that she asked to come out of the game.  M.U.'s only allegation to show that she was in physical distress is that she "was crying because she knew she had hit her head."  (Am. Compl. ¶ 29.)  Even assuming that Reed was able to observe this, M.U.'s crying is certainly not a definitive indicator that she had suffered a concussion.  M.U. also

alleges that the opposing coach stated that M.U. should be taken out of the game and one of

M.U.'s teammates told Reed that "M.U. had been hit in the head and needed to come out to be

evaluated." (Am. Compl. ¶¶ 27, 28.) Given M.U.'s apparent lack of objective symptoms,

however, Reed's failure to heed these comments is not indicative of deliberate indifference.

　　　　At oral argument, M.U.'s counsel urged the Court to look to Pennsylvania's Safety in

Youth Sports Act ("SYSA"), 24 P.S. §§ 5321-5323, as instructive on the standard of care owed

with regard to student athletes and concussions. (Hr'g Tr. 56:15-22; 60:22-25.) SYSA became

effective on July 1, 2012, less than two months before the scrimmage at issue. *See* 24 P.S. §

5321. It sets out concussion education guidelines for student athletes and their parents along

with concussion training programs for coaches. 24 P.S. § 5323. It also establishes protocols for

when a student athlete must be removed from a game for a suspected concussion and what

evaluation, testing, and clearance must occur before that athlete can return to play. *Id.* M.U.

argues that Reed's failure to abide by these statutory protocols shocks the conscience. (Hr'g Tr.

61:1-6.)

　　　　This argument overlooks the nature of M.U.'s § 1983 claim. "Section 1983 liability

arises only from a violation of federal statutory or constitutional rights under color of state law."

*D.R.*, 972 F.2d at 1375. Violation of a duty established by state law, therefore, cannot

independently form the basis of liability under § 1983. *Id.* at 1375 ("[I]llegality under the state

statute can neither add to nor subtract from the constitutional validity of a state's actions.")

(quotation omitted); *see also Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) ("Section 1983

imposes liability for violations of rights protected by the Constitution or laws of the United

States, not for violations of duties of care arising out of tort law."). While M.U. could possibly

argue that Reed's failure to abide by SYSA constitutes negligence per se under state tort law,[2] SYSA is inapplicable to the constitutional standard of care.  *See Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.  Remedy for the latter type of injury must be sought in state court under traditional tort-law principles.").  The existence of SYSA does not transform the nature of the factual allegations in the amended complaint.  Those factual allegations fail to state a plausible claim that Reed's conduct shocked the conscience, the second element of a state-created danger claim.

M.U. likewise fails to satisfy the fourth element of a state-created danger claim because she does not allege facts to show that Reed engaged in any affirmative conduct.  All of her allegations against Reed are allegations of omission in that he failed to take her out of the game, failed to evaluate her for a concussion, and failed to send her for a medical evaluation.  (*See* Am. Compl. ¶¶ 52-54.)  While M.U. alleges that all of Reed's actions were "affirmative acts," her characterization is a legal conclusion that the Court can properly disregard.  *Fowler*, 578 F.3d at 210-11.  It is reasonably clear that the relevant factual allegations against Reed are ones of inaction, not of action.  *See, e.g.*, *Goss v. Alloway Twp. Sch.*, 790 F. Supp. 2d 221, 227 (D.N.J. 2011) ("The essence of Plaintiff's claim is that Defendants did nothing to make the playground safer before Plaintiff was harmed but after other students were injured.  Although Plaintiff frames his allegations in terms of affirmative acts, the identified policies illustrate inaction: to not add padding to the playground and to not supervise the students.").

---

[2]      SYSA specifies that a coach shall remove a player from athletic activity where the player "exhibits signs or symptoms of a concussion or traumatic brain injury . . . ." 24 P.S. § 5323(c).  As previously discussed, however, the amended complaint does not allege facts to show that M.U. made any subjective complaints or displayed any objective concussion symptoms during the game.  Consequently, it is not clear that Reed even violated the protocols set forth in SYSA.

While the Third Circuit has "acknowledged that the line between action and inaction may not always be clear," it also has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." *Bright*, 443 F.3d at 282; *see also Phillips*, 515 F.3d at 235-36 (same).  Although the previously discussed high school sports cases do not always hinge on the affirmative act element, the outcomes in those cases are consistent with this Third Circuit principle.  *Compare Mann*, 33 F. Supp. 3d at 539 (denying motion to dismiss where defendants **instructed** plaintiff to continue practice after observing him getting hit and exhibiting symptoms of a head injury), *Alt*, 2012 WL 726579, at *11 (noting that "Plaintiff sustained an obvious traumatic head injury but was **forced** back onto the field of play."), *Moeck*, 983 F. Supp. 2d at 527 ("Defendant Getz **required** plaintiff, who weighed 145 pounds, to live wrestle another student who weighed 220 pounds."), *and Sciotto*, 1999 WL 79136, at *4 ("[T]he school defendants' acts of . . . **compelling** the younger student athletes to [wrestle older, heavier, and more skilled adults] placed Louis Sciotto closer to the ultimate harm suffered, increased his risk of harm, or made him more vulnerable to danger than his participation in wrestling practice would have otherwise."), *with Yatsko*, 2008 WL 2444503, at *5 ("The coaches also **did not prevent** plaintiff from acting on her desire to play in a subsequent game, despite their knowledge of her continued physical maladies."), *Leonard*, 2009 WL 603160, at *7 (dismissing state-created danger claim based upon "the **failure** of the School District Defendants to take appropriate steps to address and monitor potentially unsafe athletic activities . . . ."), *and Lavella*, 2013 WL 1838387, at *4 ("At most, there is an allegation that Defendant knew of Plaintiff's continuing headaches, the seriousness of concussions and additional risks from repeat concussions, and she **asked** Plaintiff to participate in stunting.") (quotations omitted); *see also Patrick v. Great Valley Sch. Dist.*, 296 F. App'x 258,

260 (3d Cir. 2008) (finding genuine issue of material fact as to requisite level of culpability

where "Plaintiffs present[ed] evidence that Coach Brown **directed** Rosenberg to 'live wrestle'

with a teammate that weighed roughly ninety pounds more than him . . . .").

In sum, without more, M.U.'s allegations that Reed failed to remove her from the soccer

game after she had taken a blow to the head do not state a claim under the state-created danger

theory of § 1983 liability.  While Reed's conduct may constitute negligence, the Supreme Court

has warned that § 1983 is not a vehicle to incorporate state tort law into the constitution.  *See*

*DeShaney*, 489 U.S. at 202 ("[T]he Due Process Clause of the Fourteenth Amendment . . . does

not transform every tort committed by a state actor into a constitutional violation."); *see also*

*Berg v. Cnty of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000) ("Section 1983 . . . does not provide

redress for common law torts – the plaintiff must allege a violation of a federal right.").  The

Court will heed that warning here.

The Court is acutely aware of the enhanced focus on the safeguarding of student athletes

and the detection and prevention of injury, particularly concussions, in sports today.  Many forms

of athletic competition carry with them the inherent risk of injury, including serious injury.  To

potentially equate an injury in the normal course of a game with a violation of the injured

player's constitutional rights on the facts alleged in the amended complaint would be an

unwarranted expansion of the state-created danger theory into the field of play.  M.U.'s § 1983

claim against Reed is dismissed.

The Court will nonetheless grant M.U. the opportunity to further amend her complaint on

this claim.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) ("[I]f a complaint is

vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an

amendment would be inequitable or futile.").  In civil rights cases such as this one, leave to

amend must be granted *sua sponte* before dismissing the complaint.  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).  While M.U. has already amended her complaint once, she did so by stipulation rather than in response to a ruling on a motion to dismiss.  And as the Third Circuit has acknowledged, "cases decided in this circuit . . . have not been models of clarity as to whether a state-created danger claim can be successfully maintained in the context of school sports."  *Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 54 (3d Cir. 2013).  The Court accordingly grants M.U. leave to amend her claim consistent with this opinion.

<u>M.U.'s Section 1983 Claim against DHSE and DASD</u>

Although M.U. purports to make a state-created danger claim directly against DHSE and DASD, the claim is pled as if it is a claim for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  (*See, e.g.*, Am. Compl. ¶ 59 ("Defendants' actions demonstrated an adopted practice, custom or policy that was deliberately indifferent to the health and well-being of female soccer players, including M.U.")).  The Court, therefore, will treat it as such.[3]

---

[3]       Seeing as the Court has ruled that M.U. has not sufficiently pled a claim against Reed under the state-created danger theory of § 1983 liability, it is not clear whether an analysis of municipal liability under *Monell* is necessary.  *Compare Brown v. Commonwealth of Pa., Dept. of Health Emergency Medical Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("It is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable.") *and Kneipp*, 95 F.3d at 1213 ("[O]n remand, the district court must evaluate the municipal liability claims . . . notwithstanding the outcome as to the claims against the individual police officers [under the state-created danger theory]."), *with Kaucher v. Cnty of Bucks*, 455 F.3d 418, 423 n.2 (3d Cir. 2006) ("If we determined the Kauchers had alleged a deprivation of a constitutional right [under the state-created danger theory], we would proceed to determine . . . whether the County of Bucks could be held liable.  But the initial inquiry under the . . . doctrine of municipal liability asks whether the plaintiff asserted a violation of a cognizable constitutional right.  Because we conclude the Kauchers have not alleged a constitutional violation, our inquiry . . . proceeds no further.") (citations omitted), *and Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) ("There cannot be an award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.") (quotation omitted).  Because the law in this Circuit is unclear on the point, the Court will independently evaluate M.U.'s *Monell* claim despite its ruling with regard to her state-created danger claim against Reed.

Under *Monell*, a municipality cannot be held liable under § 1983 based solely on the conduct of its employees. *Id.* at 691. Rather, for liability to attach under § 1983, the municipality itself must cause the constitutional violation at issue. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989). Plaintiffs must demonstrate that the violation of their rights was caused by a policy, custom, or practice of the municipality. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996). "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).

M.U. does not identify a custom or policy of DHSE or DASD that led to the alleged constitutional injury. Instead, she alleges that a constitutional injury was caused by a lack of "appropriate policies and procedures to assure that student athletes would be cared for responsibly by the coaching staff, including timely 'impact' assessments and other medical evaluations to prevent or minimize head trauma." (Am. Compl. ¶ 55.) The Court construes this allegation as an attempt to hold DHSE and DASD liable for a failure to properly train and supervise athletics coaches on proper concussion protocols. (*See* Am. Compl. ¶ 63 (asserting liability against DHSE and DASD for "[a]llowing improperly trained coaches to be responsible for the safety and well-being of student athletes" and "[h]iring Coach Reed without assuring that he was knowledgeable in and trained properly in practices necessary to reduce the incidence or severity of brain injury from on-field impact.").

To assert § 1983 liability under a "failure to train" theory a plaintiff must show "that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact" and that the "deficiency in training must have actually caused the constitutional violation." *Thomas v. Cumberland Cnty*, 746 F.3d 217, 222 (3d Cir. 2014)

(quotation omitted).  This deliberate indifference standard is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 223 (quotation omitted).

Under normal circumstances, "a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train."  *Id.* (quotation omitted).  However, under extraordinary circumstances, a single incident can implicate municipal liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations."  *Id.* (quotation omitted).

It is unclear here whether M.U. is purporting to proceed under a "pattern of violations" theory or under a "single violation" theory.  Indeed, it is unclear whether M.U. is attempting to assert a failure to train claim in the first place.  The Court notes, however, that the amended complaint's introduction states that "M.U. is not the only young female athlete at Downingtown who has experienced traumatic brain injury.  A recent NBC news report focused on the Downingtown girls' soccer program and the significant number of girls who are battling the life-changing consequences of a concussion injury."[4]  (Am. Compl. at 1.)  Although such a general statement is insufficient to allege a pattern of violations, it signals that M.U. may be able to allege facts sufficient to state a § 1983 claim against DHSE or DASD for failure to train based on

---

[4]      M.U. includes these statements in an unnumbered introduction section of the amended complaint.  In their motion to dismiss, DHSE, DASD, Mussoline, and Reed ask the Court to strike these statements because they are not in numbered paragraphs in accordance with Fed. R. Civ. P. 10(b) and are "immaterial to [M.U.'s] cause of action and inappropriate to her proof of causes of action . . . ."  (Sch. Defs.' Mot. to Dismiss at 12.)  Generally, improper paragraph numbering does not defeat a pleading.  *See, e.g.*, *Shaw v. Russell Trucking Line, Inc.*, 542 F. Supp. 776, 781 (W.D. Pa. 1983) ("Although, the 'Preliminary Statement' may constitute a technical violation of Rule 10(b), the Court will allow that portion of the Complaint to stand since it was sufficiently clear so as to enable each Defendant to effectively formulate a response.").  Furthermore, the typical remedy for a pleading violation is to allow the offending party to replead.  *See*, 5A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1322 (3d ed. 1998) ("Even when a failure to comply with Rule 10(b) is shown, leave to amend ought to be made available to the offending pleader since the defect does not go to the merits of the action.").  Because the Court grants M.U. leave to file an amended complaint, this portion of the school district defendants' motion is moot.

a pattern of violations theory.  Therefore, the Court dismisses M.U.'s § 1983 claim against DHSE and DASD, but will grant her leave to file a second amended complaint.  When filing the second amended complaint, however, M.U. should state more clearly exactly what theory of municipal liability she is asserting against DHSE and DASD.

**M.U.'s State Law Claims**

The Court has dismissed M.U.'s federal law claims upon which this Court's original subject-matter jurisdiction is based.  It has done so, however, with leave to amend.  The Court anticipates that M.U. will reassert her state law claims when filing her second amended complaint.  Therefore, in the interest of judicial economy, the Court will exercise supplemental jurisdiction over M.U.'s state law claims and evaluate them as challenged in the pending motions to dismiss.

M.U.'s Claims for Negligence and Recklessness

M.U. asserts separate claims for negligence (Count Two) and recklessness (Count Three).  She asserts negligence against DHSE, DASD, Reed, and Total Soccer.  She additionally asserts recklessness against Reed and Total Soccer.  There is no cause of action for recklessness under Pennsylvania law.  *See Archibald v. Kemble*, 971 A.2d 513, 519 (Pa. Super. Ct. 2009) ("In this case, even though we hold Archibald must prove Kemble acted recklessly, the cause of action remains sounding in negligence.").  Rather, recklessness is a heightened standard of care required to potentially recover punitive damages.  *Egan v. USI Mid-Atlantic, Inc.*, 92 A.3d 1, 18 (Pa. Super. Ct. 2014) ("[T]o permit an award of punitive damages, a plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct.") (quotation

omitted).  Consequently, the Court construes M.U.'s recklessness claim simply as a mechanism to recover punitive damages under her negligence claim.  Where both claims are asserted against a single defendant, therefore, the court evaluates them together.

M.U.'s Negligence Claim against DHSE and DASD

Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541, *et seq.*, bars M.U.'s negligence claim against DHSE and DASD.  The Tort Claims Act specifies that local agencies and their employees are liable only for negligent acts that fall into one of the following categories: (i) vehicle liability; (ii) care, custody, or control of personal property; (iii) care, custody, or control of real property; (iv) dangerous conditions of trees, traffic controls, or street lights; (v) dangerous conditions of utility services facilities; (vi) dangerous conditions of streets; (vii) dangerous conditions of sidewalks; and (viii) care, custody, or control of animals. 42 Pa.C.S.A. §8542.

M.U. claims that DHSE and DASD are "indirectly liable for the [negligent] conduct of Coach Reed."  (Am. Compl. ¶ 68.)  She goes on to allege that Reed was negligent in (a) deciding to leave M.U. on the field after a blow to the head; (b) deciding M.U. should play in the remainder of the scrimmage rather than be evaluated for a head injury; (c) failing to have appropriate policies in place relating to evaluation for indications of head injury; (d) allowing improperly trained coaches to be responsible for the safety and well-being of M.U. and other student athletes; (e) deciding M.U. did not need to come off the field after the blow to her head or that she did not need to see a trainer for a head injury evaluation; (f) deciding to forgo impact testing; (g) deciding not to perform a timely impact test on M.U.; and (h) creating an increased risk of harm to M.U. and other student athletes by over-working them in the school program, together with the other soccer programs [Reed] was operating on the side.  (Am. Compl. ¶ 69.)

None of these allegations fall within the exceptions to immunity specified in the Tort Claims Act. As a result, M.U. negligence claim against DHSE and DASD is dismissed. This dismissal extends to any "official capacity" claim against Reed as an employee of either DHSE or DASD. *See Palmer v. Bartosh*, 959 A.2d 508, 512 n.3 (Pa. Commw. Ct. 2008) ("Agency employees, like the Defendants here, are liable for civil damages in their official capacities only to the same extent as their employing local agency."); *cf. Tunnell v. Office of Pub. Defender*, 583 F. Supp. 762, 769 (E.D. Pa. 1984) ("[A] suit against a state official for actions taken in his official capacity is equivalent to an action against the state for purposes of the Eleventh Amendment.").

M.U.'s argument that she can overcome DHSE and DASD's Tort Claims Act immunity if she alleges willful misconduct misreads the law. (Opp'n to Sch. Defs.' Mot. to Dismiss at 4-5.) The Tort Claims Act begins from the position that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person," subject only to the above-mentioned specific exceptions. 42 Pa.C.S.A. § 8541. It then grants local agency employees the same immunity enjoyed by their employer so long as the employee was acting within the scope of employment. 42 Pa.C.S.A. § 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter."). It later specifies, however, that the *employee* does not enjoy this immunity if "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S.A. § 8550.

25

Willful misconduct, however, does not provide an exception to the local agency's immunity. *Palmer*, 959 A.2d at 512 n.3 ("The [Tort Claims] Act waives governmental immunity only for certain negligent acts of the agency or its employees; where the employee's conduct is intentional in nature, the local agency retains its governmental immunity.").  Therefore, if Reed engaged in willful misconduct, he could be individually liable, but that liability would not extend to DHSE or DASD.  *See, e.g.*, *Pelzer v. City of Phila.*, 656 F. Supp. 2d 517, 540 (E.D. Pa. 2009) ("Even though an individual employee's immunity may be stripped away by action for 'willful misconduct,' section 8542 has no affect [sic] on the employing government body's immunity."); *see also Wade v. City of Pittsburgh*, 765 F.2d 405, 412 (3d Cir. 1985) ("In this case the complaint clearly alleges conduct . . . amounting to 'willful misconduct.'  Thus, there was no cause of action for which the city's immunity would be extended to an employee under § 8542.").

M.U.'s citation to SYSA on the point of Tort Claims Act immunity is similarly misplaced. M.U. correctly points out that SYSA sets forth removal from play and return to play protocols for managing concussions and specifies that "any coach acting in accordance with [those protocols] shall be immune from civil liability."  24 P.S. § 5323.  Nevertheless, M.U.'s conclusion that because Reed did *not* follow the established procedures he is *not* immune from civil liability is a classic case of the logical fallacy of denying the antecedent.  Reed's lack of immunity under SYSA has no bearing on his immunity under the Tort Claims Act.  This is especially evident because SYSA specifies that, other than extending immunity to coaches who follow the protocols, "nothing in this act shall be construed to create, establish, expand, reduce, contract or eliminate any civil liability on the part of any school entity or school employee."  *Id.*  SYSA, therefore, may extend immunity to those who are not otherwise immune, but it cannot abrogate immunity for those covered by the Tort Claims Act.

M.U.'s negligence claims against DHSE, DASD, and Reed in his capacity as a school employee are dismissed accordingly.  These claims are statutorily barred, and further amendment would be futile.  The dismissal, therefore, is with prejudice.  *See, e.g.*, *Wiggs v. City of Phila.*, No. 13-cv-5193, 2014 WL 772528, at *6 (E.D. Pa. Feb. 27, 2014) ("[S]ince the Tort Claims Act provides the City with immunity for the state law claims asserted in Count IV, we conclude that amendment of those claims would be futile and we deny Plaintiff leave to amend Count IV.").

<u>M.U.'s Negligence and Recklessness Claims against Reed Individually</u>

To the extent M.U. alleges a negligence/recklessness claim against Reed individually, she has failed to state a claim upon which relief can be granted.  As explained above, Reed enjoys immunity for his negligent acts taken within the scope of his employment with DASD because they do not fit within any of the exceptions to immunity under the Tort Claims Act.  He can, however, be held individually liable if his willful misconduct caused M.U.'s injuries.  "Willful misconduct in this context has the same meaning as the term intentional tort."  *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001) (citing *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995)) (quotation omitted).

As previously explained, all of M.U.'s allegations against Reed sound in negligence. There are no facts to suggest that Reed "desired to bring about the result that followed" his conduct.  *Bright*, 443 F.3d at 287 (quoting *Robbins v. Cumberland Cnty Children & Youth Servs.*, 802 A.2d 1239, 1252-53 (Pa. Commw. Ct. 2002)).  Importantly, even if M.U. could allege facts sufficient to show that Reed was *reckless*, it would still not be sufficient to overcome the immunity he enjoys under the Tort Claims Act.  *See Bright*, 443 F.3d at 287 ("Thus, even where a public employee acts with a degree of culpability equivalent to 'recklessness,' Pennsylvania law nevertheless affords him immunity.").

M.U.'s negligence/recklessness claim against Reed is dismissed accordingly.  The claim is dismissed with prejudice, because further amendment would be futile.  Amendment is futile where an amended complaint "would fail to state a claim upon which relief could be granted." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010).  Here, M.U. can survive a motion to dismiss only if she can allege facts sufficient to make a plausible claim that Reed acted with a degree of culpability that is tantamount to an intentional tort.  *See Kuzel v. Krause*, 658 A.2d 856, 859 (Pa. Commw. Ct. 1995) ("For purposes of the Tort Claims Act, 'willful misconduct' is synonymous with the term 'intentional tort.'").  This level of culpability is even higher than that required to state a plausible § 1983 claim.  *See Owens v. City of Phila.*, 6 F. Supp. 2d 373, 395 (E.D. Pa. 1998) ("The record would permit a reasonable fact-finder to reach the conclusion that the officers acted with 'deliberate indifference'—as used in the federal constitutional cases—but that is a standard which falls short of intent to cause harm."); *see also Vicky M. v. Ne. Educ. Intermediate Unit*, 689 F. Supp. 2d 721, 741 (M.D. Pa. 2009) ("[E]vidence which demonstrates deliberate indifference fails to establish the type of willful misconduct necessary to pierce [Tort Claims Act] immunity.").

Again, all of M.U.'s allegations against Reed sound in negligence.  At oral argument, M.U.'s counsel acknowledged, "[W]e have as much as we could plead at this stage of the case in the pleading, granted . . . ."  (Hr'g Tr. 66:20-22.)  He also acknowledged that Reed did not verbally instruct M.U. to continue playing despite her injury.  (Hr'g Tr. 64:16-20 ("[I]f we believe that the coach had uttered those words [instructing M.U. to keep playing after the injury] I'm sure the Court knows we would – we would have put them in the complaint."))  It is clear, therefore, that M.U. cannot allege facts consistent with her current allegations that would rise to the level of culpability required to sustain a claim against Reed for willful misconduct.  Further

amendment is futile, and M.U.'s negligence/recklessness claim against Reed individually is dismissed with prejudice.[5]

<u>M.U.'s Negligence and Recklessness Claims against Total Soccer LLC</u>

M.U. also asserts a claim for negligence/recklessness against Total Soccer.  She alleges that Total Soccer is directly liable for "fail[ing] to adopt and enforce appropriate and responsible policies and procedures, in keeping with industry standards, for the prevention of head injuries and the minimization of damage from blows to the head during soccer activities and programs." (Am. Compl. ¶ 71.)  She also alleges that Total Soccer is vicariously liable for the negligence of Reed in his capacity as an employee or agent of Total Soccer.  (*See id.*)

To state a claim for negligence under Pennsylvania law, a plaintiff must allege facts sufficient to show the following: (i) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (ii) a failure to conform to the standard required; (iii) a causal connection between the conduct and the resulting injury; and (iv) actual loss or damage resulting to the plaintiff.  *Morena v. S. Hills Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983); *see also Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005) (listing elements of negligence claim under Pennsylvania law).

Here, construing M.U.'s allegations in the light most favorable to her, she appears to assert that Total Soccer had a duty to "take reasonable steps to protect M.U.'s safety and well-being."  (Am. Compl. ¶67.)  She alleges that Total Soccer breached that duty by "carelessly

---

[5]     While the Court grants M.U. leave to amend her § 1983 claim against Reed, it does so recognizing that the deliberate indifference standard is *lower* than the willful misconduct standard and that district courts must grant leave to amend civil rights claims *sua sponte* even where leave to amend is not requested.  Here, M.U. has not requested leave to amend with regard to her recklessness/negligence claim, nor has she apprised the Court of any additional factual allegations that would be sufficient for her negligence/recklessness claim against Reed to survive a subsequent motion to dismiss.  Dismissal with prejudice is proper under these circumstances.  *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007) ("In sum, we hold that in ordinary civil litigation it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint.").

creating a soccer culture that . . . placed undue pressure on student athletes to play when injured and physically overextend themselves, thereby placing themselves at greater risk of physical injury." (*Id.* ¶ 70.)

Nevertheless, M.U. does not allege any facts to connect Total Soccer with M.U.'s injuries. She does not allege facts to show that Total Soccer was connected to DHSE, DASD, or the scrimmage in which M.U. was injured. She does not even allege that she – or any of her teammates for that matter – participated in any Total Soccer training programs. The only possible connection between Total Soccer and M.U.'s injuries is Reed, which could support vicarious, but not direct, liability. Notably, although Total Soccer challenges M.U.'s negligence claims against it for both direct and vicarious liability, M.U.'s opposition brief almost exclusively focuses on Total Soccer's vicarious liability for Reed's conduct. She addresses Total Soccer's direct liability in a single conclusory paragraph. (Opp'n to Total Soccer Mot. to Dismiss at 21, Doc. No. 20.) The facts alleged in the amended complaint fail to state a plausible claim for relief against Total Soccer directly.

M.U. likewise fails to state a plausible claim for vicarious liability against Total Soccer based upon Reed's conduct. "In Pennsylvania, an employer is held vicariously liable for the negligent acts of an employee that cause injuries to third parties, provided that such acts were committed during the course of and within the scope of employment." *Doe v. Schneider*, 667 F. Supp. 2d 524, 531 (E.D. Pa. 2009) (citing *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979); *see also Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1276 (3d Cir. 1979) ("[Under Pennsylvania law, a] master is liable for the torts of his servant if the latter's tortious conduct was within the scope of his employment . . . .")). Conduct is within the scope of employment for vicarious liability purposes if (i) it is of a kind and nature that the employee is

employed to perform; (ii) it occurs substantially within the authorized time and space limits; and (iii) it is actuated, at least in part, by a purpose to serve the employer. *Amberg-Blyskal v. Transp. Sec. Admin.*, 832 F. Supp. 2d 445, 448 (E.D. Pa. 2011) (citing *Fitzgerald*, 410 A.2d at 1272).

Here, M.U. has not alleged facts sufficient to show that Reed was acting within the scope of his employment with Total Soccer while coaching M.U. during the scrimmage.  She has not alleged that Total Soccer hired Reed to coach high school soccer games.  She does not allege that Total Soccer organized, sponsored, sanctioned, or supported the scrimmage.  She alleges only that Reed "encouraged" M.U. and her teammates to buy packets of soccer lessons at Total Soccer and that M.U. and her teammates "understood" that buying lessons from Total Soccer was necessary to make the varsity team.  Without factual allegations to tie Reed's employment with Total Soccer to the scrimmage at issue, however, M.U.'s allegations fail as a matter of law.  *See, e.g.*, *Jukubiec v. Camp Nock-A-Mixon, Inc.*, No. 10-cv-4244, 2011 WL 1042301, at *3 (E.D. Pa. Mar. 18, 2011) (dismissing vicarious liability claim where plaintiff did not "aver[] that the act alleged . . . was one Defendant Lippincott was employed to perform.").

Furthermore, M.U.'s statement that "[a]t all relevant times, Defendant Coach Reed . . . was an employee, agent or ostensible agent of Total Soccer, LLC" is a legal conclusion that the Court may disregard.  *See Fowler*, 578 F.3d at 210-11.  Similarly, her argument that the scope of employment question is one for the jury is unavailing where she has failed to allege facts sufficient to state a plausible claim for relief in this regard.  *Phillips v. Nw. Reg'l Commc'ns*, 669 F. Supp. 2d 555, 580 (W.D. Pa. 2009) ("[I]f no reasonable inference from the facts supports the finding that the employee was acting in furtherance of the employer's business, the issue may properly be decided by the court.").

M.U.'s negligence/recklessness claim against Total Soccer is accordingly dismissed. However, the Court dismisses this claim without prejudice and grants M.U. leave to amend to add factual allegations in support of this claim.  As there is no separate cause of action for recklessness under Pennsylvania law, M.U. need only assert a negligence claim, if appropriate, against Total Soccer.

<u>Theresa and Thomas Urban's Claim for Recovery of Medical Costs</u>

Plaintiffs Theresa and Thomas Urban, individually, seek reimbursement from all Defendants for medical care and health-related costs they have incurred on M.U.'s behalf as well as those they may incur until M.U. turns 18.  This claim is derivative of Defendants' liability to M.U.  (*See* Am. Compl. ¶ 77 ("To the extent Defendants are liable to Plaintiff M.U., a minor, Defendants are also liable to her parents . . . in that they are responsible for their daughter's medical care and other health related costs and expenses until she reaches age 18.")).  Because none of M.U.'s claims on which to predicate this claim survive, it is dismissed as well. Dismissal, however, is without prejudice.

An appropriate order follows.


                                        */s/ Gerald J. Pappert*                          
                                        GERALD J. PAPPERT, J.